**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | |
|---|---|
| **DONALD HUGHES and ROBERT HUGHES,** | |
| **Plaintiffs,** | |
| | **CASE NO.: 06-4244-CV-C-SOW** |
| **v.** | |
| **FOX BROADCASTING COMPANY and PAUL SCHEURING,** | |
| **Defendants.** | |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Fox Broadcasting Company ("Fox") and Paul Scheuring ("Scheuring") (collectively "Defendants") submit the following memorandum in support of their Motion for Summary Judgment.

I.      <u>INTRODUCTION</u>

This is a copyright infringement action[1] by two brothers, plaintiffs Donald Hughes and Robert Hughes ("Plaintiffs"), who claim that Defendants used the real-life biographical story told by them in their 183-page manuscript (hereafter "the Manuscript/Biography") as the basis for the Fox television series "Prison Break" ("the Series").  Plaintiffs, however, misapprehend the nature of federal copyright law, which protects neither facts nor general ideas and plots contained in an author's work, but only the particular expression that the author uses to tell his story, and requires that two works be "substantially similar in their protectible expression" before there can be infringement.

---

[1]  Two state-law based claims—Count Five for unjust enrichment and Count Six for misappropriation of trade secret—were dismissed by the Court's March 14, 2007 Order granting Defendants' Motion to Dismiss under FRCP 12(b)(6).

CC 1900423v1

Here, because the alleged "similarities" between Plaintiffs' Manuscript/ Biography and Defendants' Series do not, as a matter of law, relate to "protectible" aspects of Plaintiffs' work, and do not satisfy the legal requirement of "substantial similarity of protectible expression," Plaintiffs' claims for copyright infringement should be summarily dismissed for the reasons expressed below.[2]

II.     STATEMENT OF UNCONTROVERTED FACTS

1.      Plaintiffs Donald Hughes and Robert Hughes are residents of Versailles, Missouri and purport to be the authors of the Manuscript/Biography.  Complaint, ¶¶ 3-4, 28-29.

2.      Federal jurisdiction exists as to Plaintiffs' action for copyright infringement under 28 U.S.C. §§ 1331 an 1338, and venue exists under 28 U.S.C. § 1391(b).  Complaint, ¶ ¶ 2, 7.

3.      Plaintiffs registered their Manuscript/Biography with the U.S. Copyright Office under registration number TXu 1-311-636.  Complaint, ¶¶ 42, 44.

4.      A true and correct copy of the Manuscript/Biography as deposited with the U.S. Copyright Office, obtained by Defendants therefrom, is attached as Exhibit A to the Declaration of Edward A. Ruttenberg ("EAR Decl."), which is filed with Defendants' motion papers.

5.      The Manuscript/Biography is "based on [Plaintiffs'] respective real life stories." Complaint, ¶ 28.

_____

[2]  Because this Court can conduct this comparison without resort to any evidence beyond a comparison of the Plaintiffs' Manuscript/Biography and the Series, the contents of which are undisputed, summary judgment is appropriate at this stage despite the fact that the discovery cut-off is months away.  In fact, Defendants have filed their Motion now to avoid the expenses of discovery on issues unrelated to this Motion.

2

CC 1900423v1

6.     Plaintiffs' Manuscript/Biography -- After a brief introduction and overview (pp. 2-6),[3] Plaintiffs' Manuscript/Biography tells the brothers' story as follows:

7.     On March 17, 1964, after a minor altercation with her 16-year old son, Bob, Bob's mother, who suffers from mental delusions, falsely complains to the police that Bob tried to stab her with an ice pick. As a result, Bob is incarcerated in the juvenile section of the county jail for two weeks before even learning the charge against him. He is then confined at the Missouri State Mental Hospital for 30 days evaluation. (10-11; 20-29)

8.     At the mental hospital, Bob sorts out the "normal" patients from the crazies, and learns why they are hospitalized. Bob undergoes mental tests daily, and works in the kitchen to spend less time with the "zombies." (30-35)

9.     After two weeks, Bob is transferred to a ward with more privileges. He is allowed to go outside, shoot pool, play darts and cards, mingle with the "less crazies," see movies and go to dances. When his parents visit, his mother apologizes for the trouble that she has caused him, and explains her unsuccessful attempts to undo what she has done. (37-41)

10.    Bob's tests show that he is normal, so he thinks that he will be released. Instead, however, he is transferred until age 21 to the juvenile reformatory at Boonville, "the toughest institution in Missouri for young offenders," known for its sadistic guards and teaching juveniles to become criminals. No one has ever escaped from it without being quickly recaptured. (8, 43-47)

---

[3]  All parenthetical page references in Paragraphs 6-47 of this Statement of Uncontroverted Facts are to the Manuscript/Biography.

3

11.     Bob is taken to an "orientation cottage" in the reformatory. He decides to be a model inmate to earn the trust of the officers and extra privileges, so that he can be the first to make a successful escape. (48-51)

12.     Bob befriends a black inmate before learning that fraternization between blacks and whites is frowned upon. Bob is assigned to a brick building with steel mesh on the windows, a day room, sleeping dormitory and showers/restrooms located near the main road. The building supervisor, Haas, is a decent man. Bob is assigned to work on the construction crew for Weed, a brutal guard. (51-53)

13.     Once, when Bob is assigned to pick strawberries, he sees the duty officer beat a prisoner, Douglas, who was inadvertently squeezing the strawberries as he picked them. Douglas is then thrown into the "hole" -- a single, windowless cell with only a can for human waste. On another occasion, when the prisoners refuse to eat spoiled green beans, the duty officer screams racial epithets at Jimbo and kicks him several times in the head. (53-55)

14.     Bob decides not to trust anyone. One day, when Bob accidentally tips over a wheelbarrow full of cement, Weed barely restrains himself from smashing Bob over the head with a shovel. Bob learns from other inmates that the Superintendent, DeClue, likes to watch the guards abuse the inmates. (56-58)

15.     Bob's parents are allowed to visit once a month. They tell him that they are doing everything they can to gain his release, but with no luck. (58-59)

16.     In June, Bob begins to work with a few other inmates in the bakery under a decent man named Schrader. Each of the inmates makes an unescorted trip one day each week to deliver baked goods to DeClue's house, which is just outside the main gate. (60-62)

4

17.     Bob thinks about escaping during his delivery to DeClue's house, but realizes that he "can't just take off running." On his way back, Bob notices that he is only 20 feet from the visitors' parking area, which he thinks would be a perfect place for his older brother, Don (age 20), "to have a car waiting for him." (62-65)

18.     Bob asks an inmate why he didn't try to escape when he was allowed to leave to attend a funeral. The inmate responds that it wasn't worth it to him to be on the run forever. Bob says that it's worth it to him. (65)

19.     When Bob refuses to give an inmate a belt that his parents had given him, the inmate pushes Bob down some stairs. When a guard asks what happened, Bob refuses to snitch, and earns respect among the other inmates. Bob discovers that Boonville's toughest inmate has a sweet tooth. In exchange for providing him sweets, the inmate provides Bob with protection. (65-66)

20.     DeClue decides that he will reduce the bakery staff in a month. Bob realizes that he will have only three more visits to DeClue's home to implement his escape. (67)

21.     Bob tells his parents of his escape plan, and that Don should visit on July 4 to review it. If Don agrees to help, then she should send him a letter with the word "green" in it, and they will then put the plan into action July 8. (67-69)

22.     On July 4, Don visits and checks out Bob's plan. He agrees to help. Don rents a white Plymouth Fury like those used by the Missouri State Highway Patrol, and buys side lights and a red siren dome to put on top to make it look like a police car. Bob's mother sends Bob a letter containing the word "green." (75-77)

23.     On July 8, Don waits in the parking area outside the main gate. He pretends to check the car's engine to divert attention from the fact that he has been waiting there awhile.

5

Don finally sees Bob walking to DeClue's house with bread. When Bob returns, Don pulls the car up and screams "Let's go!" Bob dives into the car, and Don speeds through the gate. Guards scream "Escape!" (8-9; 79-85)

24.     Bob changes clothes in the back seat. Both he and Don are now wearing police uniforms. Don pulls onto a dirt road and installs the side lights and siren. Back on the main road, a police car drives past and waves, thinking that Don and Bob are cops. (85-86)

25.     Outside Kansas City, Don pulls the siren back into the car and slows to the speed limit. However, when they encounter a roadblock, Don puts the siren back on, and is waved past the roadblock. They drive to Oklahoma during the night, and then back to Kansas City. In the morning, they call their parents to meet them at a café for breakfast. (87-92)

26.     The newspaper has a story about Bob's escape. The police have been to their home. They all agree that Bob must leave Missouri. Bob checks into a hotel. Don gets rid of the car and uniforms. Don visits his wife and daughter, knowing that it will be his last visit for a long time. They dye Bob's hair blond. The next day, Bob and Don take a train to stay with their aunt in Decatur, Georgia. (92-93)

27.     The boys are quickly accepted into the Decatur community. Bob becomes involved with a high school girl, Gabriel, who is also dating Brock, the school football star. When Bob and Brock are about to fight over Gabriel, Don screams "I told you to stay away from her," and knocks Bob out with a punch, later explaining that, if Bob had gotten into a fight, the police would have come, and Bob and Don couldn't afford any contact with the police. That night Bob writes his first letter to President Johnson about the horrible conditions at Boonville. (95-99)

CC 1900423v1

28.     Don meets a woman named Barbara in Kansas City, and moves into her apartment. He tries to figure out how to get work without using his social security number, which could be traced. A month later, after Barbara passes some bad checks, they have to leave Kansas City before they are visited by the police. Don tells Barbara about Bob's escape. (102-108)

29.     Desperate for money, Don purchases some blank keys and key holders. At various strip bars, he tells drunken patrons that they can have a "date" with Barbara for $100. After getting the $100, Don hands the drunk a useless hotel key, and then Don and Barbara leave with his money. After making $600 using this scheme, they leave for Tulsa, Oklahoma, to stay with Barbara's relatives. Later they get their own small apartment. (108-110, 116)

30.     After gaining revenge on Brock by tying him naked to a tree, Bob moves to his grandparents' home in Modesto, California, and works for his grandfather. He spends time with a girl, Glena, cruising, going to football games and listening to music. Bob writes often to President Johnson about the conditions at Booneville. Bob's parents visit for Christmas, and warn him that the police will soon show up at the grandparents' house. (99-101, 111-113)

31.     Bob moves back to Kansas City. His parents find him an apartment and buy him a car. He continues to write to President Johnson. Bob meets Dianne. When he lets her drive his car, she runs it up a sidewalk, and witnesses shout "call the cops" and "get the license number." Bob leaves fast, and the next day moves to Leavenworth, Kansas. (113-115)

32.     In May 1965, Bob learns from his parents that the FBI wants to talk with him under a 72-hour amnesty about the conditions at Booneville. Bob agrees. Don, Bob and their parents speak with FBI Agent Grahamn in Kansas City for an hour about the conditions at Booneville. (116-122)

CC 1900423v1

33.     Don heads to Clay County, having stolen Agent Grahamn's FBI identification badge.  He opens a bank account with $100, and gets 20 starter checks, but cashes $1,650 in checks to stock up on food.  (122-124)

34.     Don takes Bob to Tulsa, where they work on a bakery route.  (124-125)

35.     Bob turns 18 and signs up for the military draft to avoid trouble with the law.  For the next 13 months, Bob, Don and Barbara lead quiet lives.  In August 1966, Bob learns from his mother that he has been drafted.  Although he fears the authorities will find him, he reports for military duty and is inducted into the Army.  He is sent to Fort Leonard Wood in Missouri.  Bob goes through basic training, and qualifies for Officer Candidate School.  (126-130)

36.     Just before Bob graduates, however, the Military Police arrive.  Bob sneaks out a window to avoid being taken into custody.  He calls his parents.  The next morning Don picks him up and takes him back to Tulsa.  (130-132)

37.     Bob's escape and desertion from the Army make the Tulsa news, which shows photos of Bob and Don.  They decide to change their identities.  Don notices a billboard for "Cooper Tires," and they take the surname Cooper.  Don, Bob and Barbara flee to Jacksonville, Florida, where they get a mobile home.  Bob loses his virginity.  After Bob is questioned by Navy Shore Patrol, he worries that the Navy will tell the Army his whereabouts.  (132-135)

38.     Don, Bob and Barbara fly to Tampa and rent an apartment.  Don and Bob get a job selling photography sessions.  By the spring of 1967, they are doing well.  Bob hires a lawyer to help get him out of his trouble.  When the photography studio moves back to its main office in Illinois, they all move there.  (136-138)

8

39.     Barbara is arrested for cashing bad checks.  Don flashes his stolen FBI card to the officer at the police station's front desk and is allowed to meet with her in an interview room.  They escape out a window.  (138-141)

40.     The three drive to Milwaukee, then to Des Moines, Iowa.  They decide to rob a bank.  Posing as an FBI agent, Barbara notifies a local bank of a supposed bomb threat.  Bob and Don arrive, posing as the bomb squad.  They leave with a box marked "explosives" that really contains $60,000 in stolen money.  (141-147)

41.     Barbara steals payroll checks and a check imprinter.  The three leave the next day for Seal Beach, California.  Barbara uses a stolen check to buy groceries.  The police catch her.  She is sent to women's prison in Tipton.  (148-150, 153)

42.     Knowing that he will soon be arrested, Don gives their box of money to a newlywed couple.  Don is arrested and extradited to Missouri, where his parents post bond to secure his release.  He is charged with interstate transportation of forged securities.  Don receives probation on the charges against him.  Neither the escape nor the bank robbery is ever mentioned.  (150-151, 170)

43.     Bob flies to Missouri.  His parents drive him to Independence, where he rents an apartment.  After receiving a tip from one of Bob's friends seeking leniency on a charge against him, FBI agents find and arrest Bob, and take him to the stockade in Fort Riley, Kansas.  While awaiting court martial for desertion, Bob is put to work removing fences around the compound.  (150, 152, 154-156)

44.     In February 1968, Bob is found guilty of desertion at his court martial, and sentenced to six months (with credit for time served) in a minimum security prison.  He is given a General Discharge under Honorable Conditions.  As he nears his release date, he learns that

9

authorities in Missouri want to extradite him to face prosecution for crimes committed in Missouri. (162--164)

45.     On March 10, 1968, a sympathetic news article about Bob is published by a reporter for the Kansas City Star. As a result, at Bob's extradition hearing, the Judge, with the prosecutor's support, denies extradition. Bob is released. He moves to Olathe, Kansas. On July 27, 1968, Missouri drops all charges against him, and he and Don return to Kansas City. Barbara spends two years in prison. Don never sees her again. (166-171)

46.     Don takes up sky diving. He marries seven times and has countless affairs. He has 6 daughters, 2 sons, 15 grandchildren and 3 great-grandchildren. He once sold a mob boss 40 empty boxes that were supposed to contain TVs, and the boss put out a contract on his life. The biggest rumor about the brothers is that one of them is D.B. Cooper, but nothing supports the rumor. (171-172, 174-181)

47.     Bob becomes a photographer and photographs a number of beauty pageant winners. He marries briefly and has a son. He has snow white hair and is now semi-retired. His testimony helped clean up Boonville. He wrote a detailed escape plan to President Carter during the Iran Hostage crisis, and claims that the plan that failed was similar to his. (171-172, 182-183)

48.     Defendants' TV Series -- Defendant Scheuring, resident of California, is a creator of the Series and Defendant Fox, Delaware corporation with its principal business in California, is the Series' broadcaster. Complaint, ¶¶ 5, 6; Declaration of Paul Scheuring ("Scheuring Decl."), ¶¶ 3,8; Answer of Defendants, ¶ 5.

49.     The Series has now completed two seasons, with a total of 44 hour-long episodes. Scheuring Decl. ¶¶ 9, 11. In the Series:

CC 1900423v1

50.  *The Set-Up*.  Michael Scofield has had his entire body tattooed over the last few months.  He has also plastered every wall of his Chicago apartment with papers, maps and newspaper articles discussing the conviction of his brother, Lincoln Burrows, for the murder of the Vice-President's brother, and with information about criminals and other persons later revealed to be at the prison where Lincoln is being held on death row.  Michael knows that Lincoln is innocent and has been framed.  He has determined to break Lincoln out of prison.[4] (1)[5]

51.  Michael's first step in putting his very complicated plan into action is to pretend to rob a bank.  He is captured without resistance while still inside the bank.  He pleads guilty to the crime so that he can be sentenced to serve time at the same maximum security prison where Lincoln is held.  (1)

52.  Michael falsely tells the female prison doctor (who is the Governor's daughter) that he suffers from diabetes.  He obtains insulin blockers from another prisoner so that his medical records will appear to support his claim.  (1)

53.  Michael locates various items, such as screws and bolts, on the prison ground that he converts to useful tools so that, at the appropriate time, he can unscrew his cell's toilet and drop down into the prison sewer system.  He constantly pushes origami swans through the grates leading to the prison sewer system so that he can learn exactly where each section of the sewer leads.  (1-2)

54.  Michael makes it a point to meet inmate Charles Westmoreland, who is known to be the infamous D.B. Cooper, although he denies it.  Michael knows that, to avoid recapture, he

---

[4]  Every action Michael takes will prove to be part of his plan to free Lincoln.

[5]  All parenthetical references in Paragraphs 50-80 of this Statement of Uncontroverted Facts are to the number of the Series episode.

CC 1900423v1

will need financial assistance after the escape, and he believes that Westmoreland has hidden resources on the outside from his daring air hijacking that can provide such assistance.  (1)

55.     Michael befriends inmate John Abruzzi, a mob boss who controls much of what happens in the prison.  Michael knows that he will need Abruzzi's connections to help the escapees "disappear" once they are on the outside.  Michael is ultimately able to form his alliance with Abruzzi because Michael knows the hideout of a mob informant named Fibonacci whom Abruzzi wants to silence, but Michael is able to form this alliance only after Abruzzi's men cut off two of Michael's toes with garden shears in an unsuccessful attempt to force him to reveal Fibonacci's location.  Lincoln knows nothing of Michael's escape plans until Michael tells him.  (1-3)

56.     Of assistance to Michael is the fact that he worked as a structural engineer on a recent re-design of the prison, and the tattoos covering his body are the blueprints of those prison plans.  (1-2)

57.     Conflicts among the prisoners lead to a prison riot and the murders of several inmates.  (2-3)

58.     Shadowy figures on the outside have taken to murder to maintain the secret that the Vice-President's brother was not murdered, but is alive and has been imprisoned in a small cabin in Montana.  (1-3, 21, 22, 23)

59.     The Series is filled with other characters, for example, Lincoln's teenage son, LJ, who is on the border of delinquency, and Lincoln's former fiancée, Veronica, who was Michael's attorney and is now engaged to another man.  (1-3)

60.     Numerous prisoners play roles in Michael's escape plan and/or in the racial and other tensions among the prison's inmates.  (1-3)

CC 1900423v1

61.     Videotape evidence of the apparent murder of the Vice-President's brother seems to confirm Lincoln's guilt. Veronica herself has doubts even after Lincoln explains that the tape is manufactured. Veronica investigates. "Those who know" (who work for the "Company") soon learn of her activities. (2)

62.     Michael's complicated escape plan takes the first 20 episodes of the Series before it is ready for implementation in the 21st episode. Only for reasons of length, this Statement of Uncontroverted Facts addresses only the first three of these 20 episodes of "set-up." Continuing with the 21st episode:

63.     *The Escape*. Ten prisoners enter the doctor's office, which she has left unlocked to help them. Eight go through the window after removing its bars, and use telephone wires to climb out to the barb-wired outer prison wall. Then they drop down outside it. A ninth falls into the courtyard and is captured. (21, 22, 23)

64.     The 10th prisoner, Westmoreland, dies from wounds inflicted on him, and is left in the doctor's office, but first he tells Michael where he has hidden the money from his famous crime. Other escapees overhear this information. (21)

65.     Warden Pope finds the toilet removed in Michael's cell and a hole in its wall. He orders the capture of the escapees dead or alive. Squad cars speed into the night after them. Roadblocks are set up. Helicopters scan the area. (22)

66.     Abruzzi leads the men to a van parked at an old mill. He has arranged to have a plane waiting for them at a nearby airfield. Abruzzi uses a ruse to leave behind one the escapees, Haywire, whom he did not want with them. The others pile into the van and head down back roads. (22)

13

67.     Another escapee, T-Bag, has had a long-running feud with Abruzzi and fears that Abruzzi wants to kill him.  T-Bag handcuffs his left wrist to Michael's right wrist and swallows the key, thinking that Abruzzi will not kill him if it means leaving Michael behind, because Abruzzi needs Michael to tell him where Fibonacci is.  [Abruzzi later frees Michael from T-Bag by cutting off T-Bag's hand and then leaving him behind.]  (22)

68.     The escapees are forced to abandon the van after it gets stuck in mud.  They do not reach the airfield until sundown, and watch helplessly as the plane takes off without them after the air controller advises its pilot that the airstrip closes at sundown.  (22)

69.     Only Michael is aware that one escapee, Tweener, had earlier tried to betray the group.  Michael quietly tells Tweener that he must go it alone.  (22)

70.     The Series follows both the group (Michael, Lincoln, Abruzzi, Sucre and C-Note) and the separated escapees (Haywire; T-Bag; and Tweener).  (22-23)

71.     Pope's investigation uncovers the doctor's complicity in the escape.  He calls the Governor, but, before he can say anything, the Governor tells him to turn on the television.  The President has died of a massive heart attack (caused by the placement of an untraceable poison in a bottle of his drinking water), and the Vice-President has been sworn in as President.  (22)

72.     The day after the escape, FBI agents discuss the identities of the eight escapees. (23)

73.     With law enforcement in close pursuit, Michael's group runs for a passing train, jumps into a boxcar, and then out the other side.  C-Note reveals that he knows that Michael is going to Utah to find Westmoreland's money.  Michael denies it.  C-Note and Sucre get angry when Michael tells them they cannot go to see their loved ones, because the police will be waiting.  (23)

14

74.     Lincoln suggests dumping the others, but Michael says that they know about Westmoreland's money, so, if caught, they will reveal where Michael and Lincoln are headed. Michael and Lincoln ultimately plan to go to Mexico, then Panama. Michael confides that he has back-up plans and hidden supplies. (23)

75.     T-Bag arrives at a clinic operated by a Dr. Gudat. He shows Gudat his severed wrist (which he is carrying in a box), holds a screwdriver to Gudat's neck and tells him that, if he doesn't help him, he will kill Gudat's wife. (23)

76.     The FBI's lead agent, Mahone, talks to the tattoo artist who worked on Michael and figures out the tattoos' purpose. Mahone determines that Michael spent months planning the escape, and then destroyed all his plans. Mahone correctly reasons that Michael threw the evidence into the Chicago River below his apartment, and orders divers to search for it. (23)

77.     Michael digs up a cemetery plot and retrieves several buried garbage bags containing clothes for all of them; fake IDs; passports; money; prepaid phone cards and car keys to a car parked 100 yards away, which will enable the escapees to blend into the population. Having examined Michael's credit card statements and figured out that where Michael had buried his supplies, Mahone arrives, just a few minutes late. Michael watches him from nearby. (23)

78.     Veronica's investigation leads her to Blackfoot, Montana, where she locates President Reynolds' brother, Steadman, who is very much alive, but locked inside a house. Once Veronica enters, she too is trapped there by its various security devices and controls. Veronica tries to call the Blackfoot Sheriff's Department, but the call is actually routed to Steadman's captors as part of their security. She then receives a call on her cell phone from Lincoln, and tells him that she has found Steadman alive. Before she can say anything more, Steadman's

15

captors arrive, shoot Veronica (Lincoln hears this on the other end of the phone) and drag her body away. (23)

79.    Although his underlings lament that the escapees appear to have vanished, Mahone explains to them that Michael's tattoos provide: "How to get out of the prison. How to disappear afterward. Where he plans to run. How he plans to get there." Mahone says he'll be waiting for him when he does. (23)

80.    The Escapees' Flight continues over the next 21 episodes of the second season and into the as yet unbroadcast third season.

III.    STANDARD FOR SUMMARY JUDGMENT

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Supreme Court held: "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed `to secure the just, speedy and inexpensive determination of every action.'" Id. at 327 (citations omitted). Accordingly, "Rule 56(c) mandates the entry of summary judgment ... against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In copyright infringement actions, summary judgment is often granted where the plaintiff is unable to raise a genuine issue either because the works are too dissimilar or similar only as to unprotected material and thus his copyright-protected expression was not "appropriated." See Moore v. Columbia Pictures Industries, Inc., 972 F.2d 939, 945-46 (8th Cir. 1992); Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 120-21 (8th Cir. 1987); Rice v. Fox Broadcasting Co., 330 F.3d 1170, 1174 (9th Cir. 2003); Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042 (9th Cir. 1994).

16

Where, as here, the lack of similarity between the parties' respective works is obvious, summary judgment is appropriate notwithstanding the presence of potential factual disputes concerning whether defendants had access to the plaintiff's work. In such cases, the defendant simply assumes access <u>arguendo</u> solely for purposes of the summary judgment motion. <u>See</u>, <u>e.g.</u>, <u>Berkic v. Crichton</u>, 761 F.2d 1289, 1292 ("For purposes of their summary judgment motion only, the defendants stipulated the plaintiff's ownership of the copyright and their access to his work, but argued that, as a matter of law, there was no substantial similarity between [plaintiff's work] Reincarnation and [defendants' work] Coma."); <u>Litchfield v. Spielberg</u>, 736 F.2d 1352, 1355 ("For the purposes of the motion for summary judgment, defendants concede they had access. The only issue is whether summary judgment was proper as to substantial similarity.").

In accord with these cases, for purposes of the instant motion only, Defendants assume that they had access to Plaintiffs' Manuscript/Biography.[6] Accordingly, as will be shown in the section below, the only issue before the Court is whether the two works are substantially similar <u>in their protected expression</u>, an issue that Defendants submit can only be answered in the negative by a simple comparison of Plaintiffs' Manuscript/Biography with the Series.

IV. <u>ARGUMENT</u>

To prevail on any of their copyright claims, Plaintiffs must show that Defendants' Series copied protected elements from Plaintiffs' Manuscript/ Biography. <u>Feist Publications, Inc. v. Rural Telephone Service Co.</u>, 499 U.S. 340, 361 (1991); <u>Hartman</u>, 833 F.2d at 120-21; <u>Kouf</u>, 16

---

[6] To be clear, however, Defendants in fact categorically deny that they had access to Plaintiffs' Biography/ Manuscript. More specifically, the Series' creator denies ever hearing of or seeing the Biography/ Manuscript. Scheuring Decl., ¶¶ 19-20. Moreover, the person alleged in Paragraph 31 of the Complaint as having supposedly submitted the Biography/Manuscript to Fox, Jennifer DeChiara, denies unequivocally making any such submission. DeChiara Decl., ¶¶ 4-6. Additionally, the only person to whom DeChiara did submit the Biography/Manuscript, Susan Gurman, denies submitting it to Fox or anyone else. Gurman Decl., ¶¶ 4-7.

CC 1900423v1

F.3d at 1044 n.2; Shaw v. Lindheim, 919 F.2d 1353, 1355 (9th Cir. 1990); 4 Nimmer on Copyright ("Nimmer"), § 13.01 at 13-5 to -6 (2006).  Central to this determination are two separate—but related—concepts: (a) the extent to which Plaintiffs' Manuscript/ Biography contains copyrightable expression, and (b) whether Defendants copied those protected expressions.  "[T]he mere fact that a work is copyrighted does not mean that every element of the work may be protected."  Feist, 499 U.S. at 348; 4 Nimmer, § 13.01[B] at 13-8 to -15.  "Not all copying ... is copyright infringement."  Feist, 499 U.S. at 361.

A.    The Protected Expression In Plaintiffs' Manuscript/Biography Is Limited

The first step in determining whether Defendants copied protected expressions from Plaintiffs' Manuscript/Biography is to determine the scope of Plaintiffs' copyright.  Feist, 499 U.S. at 361-62; Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp., 361 F.3d 312, 318 (6th Cir. 2004); Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1442-43 (9th Cir. 1994).  This analysis involves filtering out unprotectible elements, such as facts, ideas, clichés, scenes-à-faire and conventions of story-telling and filmmaking.  Hartman, 833 F.2d at 121; Rice, 330 F.3d at 1174-75; Cavalier, 297 F.3d at 823; Apple Computer, 35 F.3d at 1442-43; Kouf, 16 F.3d at 1045; Berkic, 761 F.2d at 1293; Narell v. Freeman, 872 F.2d 907, 910-12 (9th Cir. 1989); 4 Nimmer, §§ 13.03[A][1] & [B][2]-[4] at 13-36 to -43 & 67 to -88.7.

Given the inability to claim copyright protection for facts, it necessarily follows that a plaintiff's biographical work is only protected from nearly verbatim copying of dialogue or from the comprehensive non-literal copying of their "story" or "pattern," the original arrangement of characters, their relationships and the essential sequence of events, 4 Nimmer, § 13.03[A][l][b]; Williams v. Crichton, 84 F.3d 581, 588-91 (2d Cir. 1996); Berkic, 761 F.2d at 1293-94; Olson v. NBC, 855 F.2d 1446, 1450 (9th Cir. 1988); Shaw, 919 F.2d at 1363; 4 Nimmer, § 13.03[A] [1]

18

& [2] at 13-36 to -43 & 13-53 to -59.  Moreover, under the doctrine of copyright estoppel, when a plaintiff holds out his work to the public as factual, he cannot then claim that the work is, in actuality, fiction and thus entitled to the copyright protection afforded to fictional works.  Houts v. Universal City Studios, Inc., 603 F. Supp. 26, 28 (C.D. Cal. 1984).

Here, Plaintiffs admit their Manuscript/Biography tells "their respective real life stories." Complaint, ¶ 28.  Accordingly, neither the "fact" of an "innocent brother … sent to prison" (or, in Plaintiffs' case, a juvenile camp) nor the "fact" of a "brother break[ing] the imprisoned brother out of jail" (or, in Plaintiffs' case, a juvenile camp) is protected under the copyright laws.  See Complaint §§ 40(a)-(b).  Nor is either the "fact" that "there was a vehicle waiting outside to aid the in escape" or the "fact" that after escaping from prison (or, in Plaintiffs' case, a juvenile camp), "the bothers encounter several adventures while on the run."  See Complaint §§ 40(i)-(k). These, along with each of the "facts" set forth in Paragraph 40 of Plaintiffs' Complaint are admitted facts which the Copyright Act simply does not protect.

Instead, the only elements of Plaintiffs' factual Manuscript/Biography that would be protectible under the copyright laws would be its literal form of expression, its unique selection and arrangement of the facts (outside a true-life chronological arrangement of actual events), its introduction of fictional characters (of which there are none) and any other non-factual contributions.  See 1 Nimmer, § 2.11[A]-[F].  Thus, for example, if Plaintiffs' Manuscript/ Biography contained a fictional incident the expression of which was copied by Defendants, then such copying might be actionable.  But Plaintiffs' work, which is admittedly "a manuscript based on their real life stories" (Complaint ¶ 28), simply does not contain any such fictional incident whose expression was copied by Defendants.  Instead, as addressed in detail in subpart D. below, each and every portion of Plaintiffs' Manuscript/Biography that Plaintiffs claim was stolen by

19

Defendants relates to an actual event in Plaintiffs' lives, and therefore does not relate to "protectible expression" that would support an action for copyright infringement. Thus, even assuming that Defendants copied these elements from the Manuscript/Biography (a fact which Defendants categorically deny), Plaintiffs could not maintain a copyright infringement claim for the simple reason that such facts are not copyrightable.

B.    The Tests for Determining Whether Protected Elements Have Been Copied

To determine whether a defendant's work is "substantially similar to protected expression" in a plaintiff's work where (as here) the works are not literally similar, the Eighth Circuit employs both "extrinsic" (i.e., objective) and an "intrinsic" (i.e., subjective) tests, originated in Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp., 562 F.2d 1157 (9th Cir. 1977) ("Krofft"). Moore, 972 F.2d at 945; Hartman, 833 F.2d at 120-21; Kouf, 16 F.3d at 1045. A plaintiff must satisfy both test to sustain a finding that non-literal similarities go beyond a plaintiff's unprotectible facts or ideas to invade his protectible expression. Hartman, 833 F.2d at 120-21 (citing Krofft); Kouf, 16 F.3d at 1045; Shaw, 919 F.2d at 1356, 1360-61. 4 Nimmer, § 13.03[E][3] at 13-108 to –118.

"The extrinsic test is an objective test based on specific expressive elements: the test focuses on 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works." Kouf, 16 F.3d at 1045 (quoting Berkic, 761 F.2d 1289 (9th Cir. 1985); Shaw, 919 F.2d at 1359. Because it is the "pattern" or overall story that constitutes the "original" portion of the copyrightable work, a plaintiff cannot rest a claim of copyright infringement upon lists of "random similarities" juxtaposed out of sequence. Hartman, 833 F.2d at 120 (citing Litchfield v. Spielberg; Kouf, 16 F.3d at 1045-46 ("we are equally unimpressed by Kouf's compilation of random similarities scattered throughout the

CC 1900423v1

works"); Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir. 1985) (such a list is "inherently

subjective and unreliable"); See v. Durang, 711 F.2d 141, 144 (9th Cir. 1983) (substantial

similarity cannot arise from the "accumulation of individually trivial similarities"); Williams v.

Crichton, 84 F.3d 581, 590 (2nd Cir. 1996) ("a scattershot approach cannot support a finding of

substantial similarity").

      Rather, analysis under the objective test focuses on a plaintiff's original pattern of

ingredients joined in a comprehensive whole, that is, the detail with which a plaintiff's work

describes its scenes and characters, the way those characters relate to each other, the dialogue

that it uses, and the sequences of events that carry and develop its story. Berkic, 761 F.2d at

1293; Olson, 855 F.2d at 1450; Williams, 84 F.3d at 590; 4 Nimmer, § 13.03 [A][1] at 13-36 to

43; Shaw, 919 F.2d at 1363. Thus, what must be compared are the actual concrete elements that

make up the total sequences of events and the relationships between the major characters, and the

detailed pattern formed by the works' plots, themes, dialogues, moods, settings, pace and

sequences of events. Shaw, 919 F.2d at 1362; Berkic, supra; Nimmer, supra.

      In conducting this test, the "works themselves supersede and control contrary

descriptions of them" so that each film "was the best and most relevant evidence on substantial

similarity." Walker v. Time Life Films, Inc., 784 F.2d 44, 52 (2d Cir. 1986). Thus, expert

testimony is not required. See Hartman, 833 F.2d at 120 ("the district court, while not a

qualified literary critic, was 'fitted by training and experience to compare [the] works and

determine whether they evidence substantial similarity.'"), quoting O'Neill v. Dell Publishing

Co., 630 F.2d 685, 690 (1st Cir. 1980); Rice, 330 F. 3d at 1179-80; Olson, 855 F. 2d at 1450;

Murray Hill, 361 F. 3d at 321; Shaw, 919 F.2d at 1362-63. Accordingly, "this question may

often be decided as a matter of law." Krofft, supra.

CC 1900423v1

Finally, in addition to satisfying the extrinsic test, a plaintiff's claim must be dismissed if it fails the intrinsic test, which analyzes the similarity of expression measured by the response of the ordinary reasonable person. As applied in Litchfield, often cited by the Eighth Circuit courts, in comparing the plaintiff's play to defendants' movie, the intrinsic test asks whether a "lay observer would recognize [defendant's work] as a dramatization or picturization of [plaintiff's work]. 736 F.2d at 1357. Given that this test seeks the overall lay observer's reaction, no expert testimony is allowed. Rottlund Co. v. Pinnacle Corp., 452 F.3d 726, 731 (8th Cir. 2006) (reversing because expert testimony allowed). Instead, this Court is competent to apply this test on a motion for summary judgment. Hartman, 833 F.2d at 120.

C.      No Protected Elements Have Been Copied

When measured under either the objective or the intrinsic test, a simple comparison of the Plaintiffs' Manuscript/Biography with the Series shows that no protected elements have been copied. For example, to the extent that any similarity in theme in the respective works relates to the "search for justice" for a "falsely imprisoned" character (as in "Shawshank Redemption;" "Prisoner of Zenda;" "Man In The Iron Mask," Etc.) is "common to [a] genre … and therefore do not demonstrate substantial similarity." Olson, 855 F.2d at 1451. Indeed, any "similarity" between what happens in Plaintiffs' Manuscript/Biography and in the Series results solely from their use of the unprotectible idea of creating a work involving the escape and flight of an innocent person from incarceration. Such "similarities," therefore, constitute scenes-a-faire and/or stock situations that are owned by no one, but are available for common use. Shaw, 919 F.2d at 1363. See also, Berkic, 761 F.2d at 1293-94 (affirming summary judgment for defendants even though both works dealt with the adventures of a young professional who courageously exposes criminal organizations that murder healthy people to sell their vital organs

to the wealthy); <u>Kouf</u>, 16 F.3d at 1045-46 (affirming summary judgment for defendants even though both works told comedy/adventure stories in which children are miniaturized and fight seemingly insurmountable dangers before being restored to normal size and reunited with their families); <u>Litchfield</u>, 736 F.2d at 1354-56 (affirming summary judgment for defendants even though both works dealt with the adventures of kindly aliens with special powers who are befriended by children); <u>Williams</u>, 84 F.3d at 590-91 (affirming summary judgment for defendants even though both works dealt with characters stranded in man-made animal parks encountering ferocious dinosaurs).

Similarly, any similarities that might exist between characters in the Plaintiffs' Manuscript/Biography and the Series are general and arise naturally from the subject matter (e.g., fences, inmates, guards, escapees). <u>See</u> <u>Walker v. Time Life Films, Inc.</u>, 784 F.2d 44, 50 (2d Cir. 1986) (affirming summary judgment, noting that almost every TV series about law enforcement will contain stereotypical roles of rapists, blackmailers, murderers, police informants, corrupt law enforcement personnel and politicians).

Ordinary phrases are not entitled to copyright protection. <u>Narell</u>, 872 F.2d at 911. Even so, an examination of Plaintiffs' Manuscript/Biography and the Series reveals no substantial similarities in dialogue. <u>See</u> <u>Olson</u>, 855 F.2d at 1450 ("extended similarity of dialogue [is] needed to support a claim of substantial similarity") (emphasis added). Indeed, Plaintiffs' "list of similarities" contains none that relate to any protectible dialogue. <u>See</u> Complaint, ¶ 40.

Finally, the pace of the respective works is clearly dissimilar. First, and most obviously, Plaintiffs' Manuscript/Biography takes place over a 5-year period, while the first 40+ hours of the Series take place over just a few months. Second, the plot of Plaintiffs' Manuscript/Biography is much less involved than the plot of the Series, and, therefore, Plaintiffs'

23

Manuscript/Biography moves much more slowly from scene to scene than does the Series. Further, the mood of the Series is far darker than the mood of Plaintiffs' Manuscript/Biography. While Plaintiffs' work references supposed "brutality" in numerous places, it does not actually contain scenes depicting this asserted brutality. In contrast, over the course of the Series there are at least a dozen murders, as well as fights, prison riots and the like. Consequently, the mood and pace of the relevant works are not substantially similar.

     D.    <u>Plaintiffs' List of Alleged "Similarities" (Complaint, ¶ 40) is Unavailing</u>

        Plaintiffs' approach, to offer "lists" of similarities, <u>see</u> Complaint, ¶ 40, ignores <u>Berkic's</u> admonition to compare "the total sequence of events and the relationships between the major characters" – instead of focusing on isolated elements within the plots. A story is not a laundry list of ingredients; protection inheres in the pattern by which common elements are arranged in an original fashion. Plaintiffs' lists are purposely both abstract and trivial to create false parallels.[7] Indeed, the objective comparison below of even these purported "similarities" chosen by plaintiffs confirms the fundamental differences between the works that completely belies plaintiffs' assertion of infringing similarity.

     1.    <u>"[A]n innocent brother is sent to prison"</u>

        In Plaintiffs' Manuscript/Biography, Bob (the younger brother -- age 16) is not sent to prison, but first to a county jail (for one month), then to a mental hospital (for one month) and then to a juvenile reformatory (for 6-7 weeks before he escapes), after his mother falsely accuses him of attacking her with an ice pick. By contrast, in the Series, Lincoln (the older brother – in his 30s) has been falsely accused and convicted of the murder of the Vice-President's brother,

---

[7] This same analysis was expressly disapproved by the Ninth Circuit in <u>Shaw I</u>, 919 F.2d at 1362-63, which equated it with an illustrative chart comparing "Star Wars" with "the Wizard of Oz", <u>Id.</u> (Reproduced in Appendix A of this Memo).

CC 1900423v1

and sent to death row in a maximum security prison for long enough that all of his appeals have been exhausted and his date of execution has been set.

2.      <u>"[T]he brother breaks [the] imprisoned brother out of jail"</u>

In Plaintiffs' Manuscript/Biography, Don does not "break" Bob out of jail; instead, after Bob makes his normal bakery delivery to the superintendent's house outside the reformatory walls, he jumps into Don's waiting car. In the Series, in contrast, Michael, a structural engineer who was involved in an earlier retro-fitting of the prison, intentionally commits a bank robbery so that he can be sent to the same prison as Lincoln. Michael has spent months before his incarceration planning for Lincoln what has to be the most intricate escape ever devised, including tattooing his body with blueprints for the prison, dropping origami swans into the prison's sewer system to learn how it is designed, pretending to be diabetic in order to gain entry into the prison infirmary to study its layout and getting married just so that his "wife" will have the right to conjugal visits during which she can deliver materials that he needs to implement his plan Indeed, the preparation for Michael's escape plan takes the first 20 hour-long episodes of the Series.

3.      <u>"[T]here is a prominent character named D.B. Cooper in [Plaintiffs' Manuscript/Biography] and [the Series] has a prominent character with the same exact name, D.B. Cooper."</u>

There is no D.B. Cooper character whatsoever in Plaintiffs' Manuscript/ Biography. Instead, in the Introduction and Epilogue, the Plaintiffs are interviewed about the possibility that one of them is the supposedly the real D.B. Cooper, which Don denies. Biography at 174-175.[8]

---

[8] Given that D.B. Cooper's leap into folklore did not occur until 1971, it is obvious that no D.B. Cooper character played a role in Plaintiffs' work, which focused on events in plaintiffs' life occurring between 1964 and 1969, before Cooper leaped to fame. The public's fascination with

25

In the Series, in contrast, one of the inmates whom Michael involves in his intricate escape plan turns out, in fact, to be the infamous D.B. Cooper, now an old prisoner using the name Charles Westmoreland. Westmoreland wants to escape because his daughter is dying from cancer, and Michael needs his participation because, once on the outside, the escapees will need a source of money in order to disappear, and Westmoreland (Cooper) has buried millions from his ransom in the Utah desert.

        4.       <u>"[T]here was brutality by the guard in [Plaintiffs' Manuscript/ Biography] and there is brutality by the guards in [the Series]."</u>

That persons who are incarcerated are brutalized by their guards is a classic "scenes a faire" or stock situation in any work set in a prison or reformatory, and no one—neither Plaintiffs nor Defendants – owns that general idea. But, even then, the "brutality" in the two works is quite distinct. In Plaintiffs' Manuscript/ Biography, while Bob references the guards' supposed "abusiveness" and "brutality," the only "brutality" directed to Bob consists of his being thumped on the head with the handle of a knife on one occasion (when he does not get up with the morning alarm) and of "almost" being hit by a guard on another. The extent of described "brutality" directed to other inmates in Plaintiffs' Manuscript/Biography consists entirely of a guard beating an inmate with a can for squeezing strawberries, and a guard kicking an inmate several times for refusing to eat spoiled green beans. The "brutality" in the Series, on the other hand, includes at least a dozen cold-blooded murders; Michael has two of his toes cut off with garden shears; and another's inmate's hand is chopped off with an axe.

---

D.B. Cooper, America's only successful hijacker, is evidenced by, among other things, the fact that a Google search reveals more than 182,000 references to his name. Cooper also has his own Wikipedia page, http://en.wikipedia.org/wiki/D._B._Cooper, that identifies scores of books, films, TV shows, radio programs and songs referencing him, and a list of bars, clubs, <u>etc</u>. in Kansas City and elsewhere named after him.

5. "[W]hen planning the escape in [Plaintiffs' Manuscript/ Biography] it involved the imprisoned brother working in and escaping through the bakery and in [the Series] the escape involved the doctor's office."

Not even Plaintiffs' description of these two incidents is similar. Regardless, in Plaintiffs' Manuscript/Biography, Bob does not "escape through the bakery;" but jumps into Don's car after delivering a loaf of bread to the superintendent outside the prison walls. In the Series, Michael's intricate escape plan requires – as just one of its many complicated links -- that Lincoln be brought to the prison infirmary at a particular time, so that he can be rescued from there and join with the other escapees. Michael's escape plan has nothing to do with a bakery.

6. "[T]here is a bank robbery in [Plaintiffs' Manuscript/Biography] and there is also a bank robbery in [the Series]."

In Plaintiffs' Manuscript/Biography, after Plaintiffs have escaped and are on the run, they call in a bomb threat to a bank, after which, wearing fake bomb squad outfits, they are allowed in, rob it and escape. Their goal is the same as that of nearly all bank robbers -- they want to get money and then escape. In the Series, on the other hand, as one of the early steps in his plan to rescue Lincoln, Michael stages a bank robbery for the sole purpose of being caught so that he will be incarcerated in the same prison as his brother. He does not want money. He does not want escape. Indeed, his whole purpose is to be captured.

7. "[T]he mafia is referred to in [Plaintiffs' Manuscript/Biography] and the Mafia is referred to in [the Series]."

In Plaintiffs' Manuscript/Biography, there is a fleeting reference to a scam that occurred long after their escape in which Don sold to an unidentified "mob boss" 40 empty boxes that were supposed to contain televisions, as a result of which the mobster supposedly put a contract

out on Don's life.  This reference is not thereafter developed in any way.  In the Series, "mafia

boss" Abruzzi is a major supporting character whose participation is essential to the plan, and the

Series also contains other important "mob" characters (including Abruzzi's own mob boss and a

mob snitch) who influence Abruzzi's relationship with, and actions toward, Michael, including

his decision to have two of Michael's toes cut off.

> 8.      "[T]he escape had to be done by a certain date in [Plaintiffs'
>
> Manuscript/Biography] and the escape had to be done by a certain date in
>
> [the Series]"

The "ticking clock" is a standard dramatic device that appears in innumerable book and

films.  It is designed, of course, to convey a sense of urgency and therefore a sense of excitement

and fear absent which dramatic works are not very dramatic.  Here, the "ticking clocks" in the

respective works are entirely distinct.  In Plaintiffs' Manuscript/Biography, Bob must carry out

his particular escape plan (simplistic as it is) by a specific date known to him (and not thereafter

changed) because, after that date, he will lose his bakery job and thus his ability to leave the

reformatory walls to make his weekly bakery delivery to the superintendent's house.  In the

Series, Michael must carry out his complicated escape plan by a specific date because that date is

literally an absolute "deadline" -- it is the date of Lincoln's scheduled execution, although that

date is extended several times.  After Michael's deadline, of course, Michael will have no

opportunity to form a different escape plan for Lincoln.

CC 1900423v1

9.    "[T]here was a vehicle waiting outside to aid the escape in [Plaintiffs'
Manuscript/Biography] and there was a vehicle waiting outside to aid the
escape in [the Series]"

In Plaintiffs' Manuscript/Biography, Don simply waits right outside the prison walls in his rented car, disguised as a police car, for Bob to dash in after making his bakery delivery. In the Series, there is no vehicle waiting for the escapees right outside the prison walls. Rather, they must navigate through miles of woods to reach a large van that Abruzzi, the mob boss (not Michael), has arranged to have left for them. They do not disguise the van as a police vehicle, but kick out the lights to help avoid detection. However, the vehicle fails in its task to get them to a plane that Abruzzi has also arranged to have waiting for them at a nearby airstrip, but, instead, gets stuck in the mud and must be abandoned. The escapees are then forced to race on foot to the airstrip, but they arrive too late, and watch helplessly as the plane takes off without them.

10.    "[N]o one had ever escaped from the institution in [Plaintiffs'
Manuscript/Biography] and no one had ever escaped from the institution
in [the Series]"

The "institution" in Plaintiffs' Manuscript/Biography is a juvenile reformatory. In the Series, it is a maximum security prison." Moreover, that a facility from which a hero is trying to escape is supposedly "escape-proof" is a classic scene a faire or stock situation. How much less dramatic would an escape be if it were not from a prison thought to be "escape-proof"? Further, Bob acknowledges in Plaintiffs' work that juveniles had previously escaped the reformatory, but had thereafter ultimately been recaptured (thereby demonstrating more the inability of the escapees to avoid re-capture than the impossibility of escape from the facility).

CC 1900423v1

11. "[A]fter the escape in both [Plaintiffs' Manuscript/Biography] and [the Series] the brothers encounter several adventures while on the run."

Everyone about whom readers would like to read or TV viewers would like to watch has "adventures," and Plaintiffs certainly do not hold a copyright monopoly on "adventures." That Plaintiffs can offer no specific "adventure" shared by the escapees while on the run further demonstrates the lack of substantial similarity of protectible expression between the two works.

Because the "works themselves supersede and control contrary descriptions of them," Walker, supra, 784 F.2d at 52, this Court may determine as a matter of law that the Plaintiffs' Story and Defendants' Series are not substantially similar as to protected expression.

V.     CONCLUSION

For all the foregoing reasons, Defendants respectfully submit that this motion for summary judgment should be granted and Plaintiffs' Complaint should be dismissed with prejudice.

Respectfully submitted,

LATHROP & GAGE, LC


By /s/Bernard J. Rhodes
   Bernard J. Rhodes (MO #29844)
   2345 Grand Blvd., Suite 2400
   Kansas City, MO  64108
   (816) 292-2000 – Telephone
   (816) 292-2001 – Facsimile

ATTORNEYS FOR DEFENDANTS
FOX BROADCASTING COMPANY
and PAUL SCHEURING

OF COUNSEL:
Louis P. Petrich
Edward A. Ruttenberg
Leopold, Petrich & Smith, P.C.
2049 Century Park East, Suite 3110
Los Angeles, CA 90067-3274

## CERTIFICATE OF SERVICE

I certify that on this 14th day of May, 2007, I filed the above pleading with the Western

District of Missouri CM/ECF system, which will send a notice of filing to:

James W. Schottel, Jr.
1221 Locust St. , Fl. 8
St. Louis, MO 63103
jwsj@schottelijustice.com


/s/ Bernard J. Rhodes
Attorney for Defendants

CC 1900423v1

## APPENDIX A

## LIST OF ABSTRACT "SIMILARITIES" BETWEEN
## "STAR WARS" AND "THE WIZARD OF OZ"

1.      Both are fantasy films that revolve around battles between good and evil.

2.      The heroes each live with his/her aunt and uncle.

3.      Each work has small, lovable and loyal characters (R2D2; Toto) who accompany the protagonists and are captured and almost destroyed.

4.      The protagonists are also accompanied by talking, human-shaped beings who are made of metal (C3PO; Tin Man).

5.      The heroines are befriended by two men and a hairy creature (Luke, Han, Chewbacca in "STAR WARS"; Scarecrow, Tin Man, Lion in "THE WIZARD OF OZ").

6.      Each contains a tall, thin character who moves in a very gingerly and awkward manner (C3PO; Scarecrow).

7.      Very early in both works, the protagonists are shown interacting with their families.

8.      Through events beyond their control, the heroes leave the security of their homes, are put in dangerous, unfamiliar situations, and, with a group of loyal companions, overcome threats to their lives.

9.      The heroes travel through space (Luke Skywalker in a spaceship; Dorothy in her house in the tornado).

10.     There are seemingly omniscient male figures who represent power and wisdom in both works (Ben Kenobi; the Wizard).

11.     The heroes make perilous journeys to the homes of the omniscient male figures.

12.     In each, the protagonists see and listen to life-like projected images of people (Leia's hologram; the Wizard's face in his giant machine).

13.     Each work contains small, amusing characters with odd voices ("STAR WARS" has the Jawas - the short, robed desert people with shining eyes - and the small service robots that scoot around the Death Star; "THE WIZARD OF OZ" has the Munchkins).

14.     The female protagonist in each is captured by the black-caped villain (Darth Vader captures Princess Leia; the Wicked Witch of the West captures Dorothy).

15.     The male protagonists in each sneak into the villain's fortress, knock guards unconscious and put on the guards' uniforms in order to rescue the female protagonist.

16.     In each, the heroes are told that they must look within themselves to find the means to solving the problems at hand. (Ben tells Luke he must find the Force within him; Glenda, the Good Witch of the North, tells Dorothy that she has the means to get home within her.)

17.     The heroes are each given objects with special, mystical powers (the light saber; the red shoes).

18.     In their travels, the heroes encounter a number of strange and sometimes menacing characters/creatures (e.g., the bizarre patrons of the bar and the monster in the trash compactor in "STAR WARS"; the flying monkeys, talking trees and witches in "THE WIZARD OF OZ").

19.     Late in each work there is a ceremony in which awards are presented to the protagonists (in "STAR WARS" they receive medals; in "THE WIZARD OF OZ" they symbolically receive brains, a heart and courage).

2